# Federal Defenders
## OF NEW YORK, INC.

One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

---

**David E. Patton**
*Executive Director and Attorney-in-Chief*

**Deirdre D. von Dornum**
*Attorney-in-Charge*

August 1, 2017

The Honorable Raymond J. Dearie
Chief United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, N.Y. 11201

<u>U.S.A. v. Alexey Barysheff, 17 CR 0121 (RJD)</u>

Your Honor:

### Preliminary Statement

My client, Mr. Alexey Barysheff, made false statements in shipper export forms. He did so as part of a larger conspiracy to illegally export electronics to Russia without the necessary licenses from the Department of Commerce. But, as the Probation Department has pointed out, "his involvement in this conspiracy was limited," and this mistake is his "only known involvement in criminal conduct," or "encounter with the criminal justice system." In his case, "[i]ssues of rehabilitation and specific deterrence appear to be fairly insignificant concerns . . . ." For these reasons, Probation has recommended a sentence of time served. We agree with the recommendation.

The reasons in support of a sentence of time served are even stronger than Probation realizes. Its Guidelines calculation is erroneous. The correct calculation does not, as Probation proposes, yield an imprisonment range of 37-46 months, but rather of 0-6 months. If a sentence of time served is justified with an advisory imprisonment range of 3-4 years, then such a sentence is even more justified with a range of 0-6 months.

Based on a correct calculation of the Guidelines, Mr. Barysheff's history and characteristics, his low risk of recidivism, and sentencing parity, we ask the Court to impose a sentence of no more than time served.[1]

---

[1] This submission refers to the Presentence Report ("PSR"); the U.S. Probation Department Sentence Recommendation ("Prob. Rec."); and the Plea Agreement, of March 21, 2017 ("Plea Agr."). The first paragraph quotes from Probation's Sentence Recommendation.

1

## ARGUMENT

### I.

### THE PRESENTENCE REPORT HAS CALCULATED THE ADVISORY SENTENCING GUIDELINES INCORRECTLY

Mr. Barysheff pled guilty to an information charging him with "submit[ting] false and misleading export information through Shipper's Export Declarations and the Automated Export System relating to the international shipments . . . of electronic components from the United States to Finland," in violation of 13 U.S.C. §305(a)(1). The advisory Sentencing Guidelines fail to cross-reference this felony to a specific Guidelines section. When the advisory Guidelines fail to specify a section applicable to a felony, the "most analogous offense guideline" applies. *See* U.S.S.G. §2X5.1. The question here is what Guideline is most analogous to the felony, as the title to Mr. Barysheff's Information states, of "Submission of False Export Information."

**A.      The Appropriate Guideline Is §2B1.1.**

The appropriate Guideline is Guideline §2B1.1, which is the section applying to the felony of a false statement to a federal official, in violation of 18 U.S.C. §1001. The gravamen of Mr. Barysheff's crime was submitting "false and misleading export information." That misconduct is really a sub-set of the larger category set forth in 18 U.S.C. §1001. *E.g.*, 18 U.S.C. §1001(a)(in dealing with, *inter alia*, the federal executive branch, a person may not falsify or conceal a material fact, make "any materially false, fictitious, or fraudulent statement or representation," or do the latter through any "false writing or document"). The maximum penalty under both 13 U.S.C. §305(a)(1) and 18 U.S.C. §1001 are the same: five years.

Guideline §2B1.1 is the "most analogous offense guideline" not only under a categorical approach but also in light of this case's factual circumstances. The Presentence Report itself makes clear that Mr. Barysheff's crime, and the extent of his participation in the illegal scheme, involved false statements and fraudulent documentation: "He was aware that *the false statements* he made, and *fraudulent documentation* he utilized, were necessary to ship the items without licenses, and that doing so was illegal, but he had *no additional knowledge of the criminal conduct involved in the conspiracy* being carried out by Aelek." (PSR, ¶31; emphasis added.)

The section of Guideline §2B1.1 that applies for setting the base offense level is the second, with a level 6, rather than the first, with a level 7. That marginally higher base offense level applies only upon two conditions that do not obtain here. First, "the defendant [must have been] convicted of an offense referenced to this guideline," U.S.S.G. §2B1.1(a)(1)(A), but Mr. Barysheff was not convicted of such an offense. Second, "that offense of conviction [must have] a statutory maximum term of imprisonment of 20 years or more," U.S.S.G. §2B1.1(a)(1)(B), while the statutory maximum here is the much lower 5 years. Since the two conditions necessary for base offense level 7 do not apply, the base offense level here must be 6. *See* U.S.S.G. §2B1.1(a)(2).

In short, since Mr. Barysheff's crime consisted of false statements and fraudulent documentation, the "most analogous offense guideline" is Guideline §2B1.1, and the base offense level under that Guideline is 6.

**B.     The Presentence Report Is Wrong to Rely on Guideline §2M5.1(a)(1).**

In seeking the "most analogous offense guideline," the Presentence Report fails to consider Guideline §2B1.1 (or 18 U.S.C. §1001) and fails to engage in any comparative analysis at all. Those two failures are significant because there is no logical way to determine what guideline is "most analogous" without considering alternatives. Rather the Presentence Report simply asserts that "[s]ince [Mr.] Barysheff was involved in the conspiracy to evade the restrictions set by EAR [Export Administration Regulations], and in turn violate the IEEPA [International Emergency Economic Powers Act], in violating national security controls, USSG §2M5.1(a)(1) applies." (PSR, ¶31.) But Guideline §2M5.1(a)(1) is not the "most analogous offense guideline" – or analogous at all.

The gravamen of Guideline §2M5.1(a)(1) is the violence of war and terrorism. That much is clear by its terms. It applies either to controls related to "national security" or "the proliferation of nuclear, biological or chemical weapons," U.S.S.G. §2M5.1(a)(1)(A), or "a financial transaction with a country supporting international terrorism." U.S.S.G. §2M5.1(a)(1)(B). Unlike Mr. Barysheff's crime of the "Submission of False Export Information," Guideline §2M5.1(a)(1) applies to such statutes as one explicitly mentioning terrorism, *e.g.*, 18 U.S.C. §2332d (financial transactions with the government of a country supporting international terrorism), or another unique to Iran. *E.g.*, 18 U.S.C. §8512 (economic sanctions relating to Iran). Furthermore, unlike the five year maximum for the crime to which Mr. Barysheff pled guilty, *see* 13 U.S.C. §305(a)(1), these statutes carry significantly higher maximums. *E.g.*, 18 U.S.C. §2332d (10 years); 18 U.S.C. §8512 (20 years).

Guideline §2M5.1(a)(1) is not the "most analogous offense guideline," or analogous at all, not only under a categorical approach but also in light of this case's factual circumstances. From the beginning, the government has informed defense counsel that this case has nothing to do with military weaponry, let alone terrorism or Iran. Rather, as the Presentence Report makes clear, the case involves the export of electronic technology (such as digital-to-analog converters and integrated circuits) accompanied by false paperwork rather than the required licenses (*see* PSR, ¶¶12-19).

The government itself recognized that the concerns animating Guideline §2M5.1(a)(1), with its base offense level of 26, are not relevant here since it calculated its Guidelines estimate (in the plea agreement that it prepared), based on Guideline §2M5.1(a)(2), with its significantly lower base offense level of 14 (Plea Agr., ¶2).

In short, Probation erred in concluding that the most analogous offense guideline is Guideline §2M5.1(a)(1).

**C.     The Government Is Wrong to Rely on Guideline §2M5.1(a)(2).**

The end of this submission's immediately preceding section raises the issue of whether the government was correct in relying on Guideline §2M5.1(a)(2).[2] There are two reasons why it is not.

---

[2] The plea agreement includes the unusual provision that the defendant "disputes" the government's estimate that uses the base offense level of 14 and "reserves the right to argue at sentencing that a different Base Offense Level is applicable." (Plea Agr., ¶2.)

First, Guideline §2M5.1(a)(2) is not the "most analogous offense guideline" because, for the reasons set forth above (*see* §I.A. *supra*), Guideline §2B1.1 is a good fit – and a better fit. What does Guideline §2M5.1(a)(2) have to recommend it? It is embodied in the lone word "otherwise." That word, "otherwise," might make sense when the Guideline is applied in the standard case, namely, when the Guidelines' Appendix A, the Statutory Index, specifically refers a crime to this Guideline but the description of the base offense level in sub-section (a)(1) does not apply. In such a situation, the assumption is that the case is less egregious than sub-section (a)(1) and instead should fall under sub-section (a)(2). But the word "otherwise" makes no sense when applied to a case in search of the "most analogous offense guideline." Then Guideline §2M5.1 can apply only if sub-section (a)(1) applies. If not, the word "otherwise" must be void for vagueness. There is no way to decipher its meaning. It could only occasion perplexity or invite arbitrariness.

The second reason that the government is misguided in favoring Guideline §2M5.1(a)(2) as the "most analogous offense guideline" is the Guideline's commentary. What would Guideline §2M5.1(a) cover if not weapons of war or terrorism? The Commentary suggests a penumbra of other "security interests of the United States." U.S.S.G. §2M5.1, comment. (n. 2)("In determining the sentence within the applicable guideline range, the court may consider the degree to which the violation threatened a security interest of the United States, the volume of commerce involved, the extent of planning or sophistication, and whether there were multiple occurrences."). But the present case does not involve "a security interest of the United States." The Presentence Report presents no information that the unlicensed export here of electronic equipment, such as digital-to-analog converters and integrated circuits, threatened the United States. Illegal, yes. A security threat, no.

In short, the government erred in concluding that the most analogous offense guideline is Guideline §2M5.1(a)(2).

D. **The Application of Guideline §2B1.1 Here Yields an Advisory Imprisonment Range of 0-6 Months.**

With a base offense level of 6, U.S.S.G. §2B1.1(a)(2); a reduction of 2 for minor role, (PSR, ¶38); and a reduction of 2 for acceptance of responsibility (*id*., ¶42), the total offense level is 2. With a criminal history category of I (*id*., ¶47), the advisory Guidelines imprisonment range is 0-6 months. That range is pretty low. It is a reason, even taken alone, for a sentence of time served.

But the Court need not take that advisory Guidelines range alone. As we now show, there are more reasons for imposing a non-custodial sentence.

**II.**

**THE COURT SHOULD IMPOSE A LOW SENTENCE BECAUSE MR. BARYSHEFF POSES LITTLE RISK OF RECIDIVISM**

A. **The Issue of Recidivism Is a Critical Sentencing Consideration.**

A sentence should be "sufficient, but not greater than necessary, to comply with the purposes" of federal sentencing, 18 U.S.C. §3553(a), and one of the major purposes of sentencing is to avoid recidivism, *i.e.*, to deter the particular defendant from committing further crimes, 18

4

U.S.C. §3553(a)(2)(B), and "to protect the public from further crimes of the defendant." 18 U.S.C. §3553(a)(2)(C). In keeping with this sentencing purpose, one district court immediately after *Booker* reduced a sentence in part based on its conclusion that "that defendant is not a danger to society and is highly unlikely to reoffend." *U.S. v. Ranum*, 2005 WL 161223, at *6 (E.D.Wisc., Jan. 19, 2005).

The Sentencing Reform Act focused attention on the risk of recidivism by ordering the Sentencing Commission (the "Commission") to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense . . . . " 28 U.S.C. §994(j). The criminal history category in general is supposed to account for both the likelihood of recidivism and moral culpability. U.S.S.G. Ch. 4, Pt. A, intro. comment. But by folding first offenders into criminal history category I, the Guidelines dramatically increased the incarceration rate for non-violent first offenders compared with the pre-Guidelines pattern – despite the Congressional directive, despite the reduced culpability of first offenders, and despite their low recidivism rate. *See U.S. v. Germosen*, 473 F.Supp.2d 221, 227 (D. Mass. 2007).

In determining whether a sentence furthers the sentencing purpose of avoiding recidivism and whether the advisory Guidelines, even for a defendant falling into criminal history category I, imposes a sentence "greater than necessary," a court should inquire into the empirical evidence about recidivism. The Supreme Court's sentencing decisions call for such an inquiry. In *Kimbrough*, the Supreme Court found that a district court had not abused its discretion in concluding that the Guidelines for crack cocaine "yields a sentence 'greater than necessary' to achieve §3553(a)'s purposes," because the Sentencing Commission did not exercise "its characteristic institutional role" in producing the crack Guidelines, which were not the product of "empirical data and national experience . . . . " *Kimbrough v. U.S.*, 128 S.Ct. 558, 575 (2007). Similarly, in *Gall*, the Supreme Court stated that while the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," "not all of the Guidelines are tied to this empirical evidence." *Gall v. U.S.*, 128 S.Ct. 586, 594, 594 fn.2. (2007).

As we now show, the "empirical data and national experience," as developed by the Sentencing Commission in its own recidivism studies, show that a low sentence, even one of time served, is reasonable here since a first offender, like Mr. Barysheff, is among the least likely to commit a crime ever again.

**B.**     **The Court Should Reduce Mr. Barysheff's Sentence Because Empirical Evidence Shows that He Poses Little Risk of Recidivism.**

There is little chance that Mr. Barysheff will commit another crime. Objective data developed by the Sentencing Commission shows as much. Mr. Barysheff is among those defendants who, according to a statistical study by the Commission, are least likely to recidivate: those who are in Criminal History Category I (PSR, ¶47), have no criminal history points (*id*.), and have had no prior arrests or contacts with the criminal justice system at all (*id*., ¶¶45-50). Commission, "Recidivism and the 'First Offender': A Component of the Fifteen Year Report on the U.S. Sentencing Commission's Legislative Mandate," Research Series on the Recidivism of Federal Guideline Offenders, Release 2 (May 2004), at 5, 13-14. The recidivism rate for those with two or more criminal history points was 36.5%; for those with only one point was 22.6%; for those with no points but with prior arrests was 17.2%; and for those, like Mr. Barysheff, with neither points nor

prior arrests was 6.8%. *Id*. Thus, offenders, like Mr. Barysheff, "who have never been arrested have the lowest recidivism risk of all." *Id*. at 17.

Mr. Barysheff has other characteristics that Commission data show is associated with low recidivism, such as having stable employment, *see* Commission, "Measuring Recidivism," at 12; having secondary education, *see id.*; and not using illicit drugs. *See id.*, at 13. These characteristics fit Mr. Barysheff. While he is now working part-time as he seeks full-time employment, he has a history of employment (PSR, ¶¶66-71). He has a good education (*id*., ¶64). He has no substance abuse problem (*id*., ¶¶62-63). He has also complied with all conditions of his release (*id*., ¶3).

Other factors also make clear that Mr. Barysheff is unlikely to commit any crimes in the future. Most important, he has a stable sense of self. He has empathy, as illustrated by his living for a time with his father in the hope of discouraging him from drinking (PSR, ¶53). One reason that he broke up with his wife is that she did not want children while he did and does (*id*., ¶55).

One factor left in the hands of the Court may also have an effect. Overall, offenders are less likely to recidivate after a sentence of probation rather than prison. Commission, "Measuring Recidivism," at 13; *see also* Eric Holder, U.S. Department of Justice, "Shifting Law Enforcement Goals to Reduce Mass Incarceration" (September 23, 2014)[3]("[H]igh incarceration rates and longer-than-necessary prison terms have not played a significant role in materially improving public safety, reducing crime, or strengthening communities. In fact, the opposite is true . . . . We know that over-incarceration crushes opportunity."); National Institute of Corrections, the Community Corrections Collaborative Network,[4] *Myths and Facts* (2016),[5] at 4 (those confined to prison recidivate at a much higher rate than those sentenced to community corrections, as exemplified in the findings of a recent analysis of Florida state prison recidivism patterns that imprisonment creates a "crime-producing effect," yielding 15.4% higher recidivism rate of those who had been imprisoned compared with those who had been sentenced to community corrections."); Missouri Sentencing Advisory Commission, "Probation Works for Nonviolent Offenders," 1 *Smart Sentencing* (June 3, 2009)("A recidivism study of the outcomes of offenders supervised by the Missouri Department of Corrections indicates . . . that recidivism rates actually are lower when offenders are sentenced to probation, regardless of whether the offenders have prior felony convictions or prior prison incarcerations."); Roger Warren, for the Crime and Justice Institute; National Institute of Corrections, Community Corrections Division, U.S. Department of Justice; and National Center for

---

[3] http://www.brennancenter.org/analysis/keynote-address-shifting-law-enforcement-goals-to-reduce-mass-incarceration.

[4] The Community Corrections Collaborative Network ("CCCN") is comprised of the leading associations representing 90,000-plus probation, parole, pretrial, and treatment professionals around the country, including the American Probation and Parole Association ("APPA"), the Association of Paroling Authorities International ("APAI"), the Federal Probation and Pretrial Officers Association ("FPPOA"), the International Community Corrections Association ("ICCA"), the National Association of Drug Court Professionals ("NADCP"), the National Association of Pretrial Services Agencies ("NAPSA"), and the National Association of Probation Executives ("NAPE").

[5] https://s3.amazonaws.com/static.nicic.gov/Library/032698.pdf.

State Courts, "Evidence-Based Practice to Reduce Recidivism: Implications for State Judiciaries" (2007), at 11 ("The research evidence is unequivocal that incarceration does not reduce offender recidivism.  To the contrary, incarceration actually results in slightly increased rates of offender recidivism.").  Jail time here would be counter-productive.

Thus, objective data and empirical evidence as well as the history and characteristics of this first-time offender show that Mr. Barysheff poses little risk of recidivism.  Because the risk of recidivism is so small, the Court should impose a sentence of no more than time served.

### III.

### THE COURT SHOULD DOWNWARDLY DEPART AND VARY BELOW THE ADVISORY GUIDELINES TO AVOID AN UNWARRANTED SENTENCING DISPARITY

In determining sentence, a court should consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct . . . ." 18 U.S.C. §3553(a)(6).

Probation has pointed out that Dmitrii Karpenko and Alexey Krutilin, the two other defendants prosecuted in connection with this conspiracy, were much more culpable than Mr. Barysheff.  Those two "were involved in the conspiracy for a shorter period time, but they were more directly involved with the negotiations of the sales of the items and they were more aware of the ultimate goals of Aelek, for whom they worked in Russia." (Prob. Rec., at 2.)  Nonetheless, they received the same minor role reduction as Mr. Barysheff (PSR, ¶30).  They were both sentenced to time served, approximately 7 months (*id*., p. 1; *see also* Prob. Rec., at 1 [Mr. Barysheff's "role in the conspiracy was even more limited than that of his co-defendants, Krutilin and Karpenko, who both received sentences of time served after being in custody for approximately 7 months."]).  Thus, as Probation correctly concludes, for Mr. Barysheff "to be punished more severely for his actions than they were for theirs would be an imbalanced assignment of punishment." (Prob. Rec., at 2.)

In short, to avoid unwarranted sentencing disparities, the Court should impose a sentence of no more than time served.

### Conclusion

For the foregoing reasons, the defense asks that the Court impose a sentence of no more than time served.

Sincerely,

/s/

Douglas G. Morris
Assistant Federal Defender
(718) 330-1209

cc:     Assistant U.S. Attorneys Peter Baldwin and Craig R. Heeren

U.S. Pretrial Services Officer Robert Stehle

U.S. Probation Officer Jennifer Fisher

Clerk of the Court

Mr. Alexey Barysheff